UNITED STATES DISCTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RICHARD MALONE, individually and on behalf of all others similarly situated, | § § § | |
| | § | Civil Action No. 5:16-cv-0955 |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMAND |
| v. | § | |
| | § | |
| CST BRANDS, INC., KIM LUBEL, ALAN SCHOENBAUM, DONNA M. BOLES, ROGER G. BURTON, ROCKY B. DEWBRE, THOMAS ("TAD") W. DICKSON, RUBEN M. ESCOBEDO, DENISE INCANDELA, JOSEPH E. REECE, STEPHEN SMITH, JOSEPH V. TOPPER, JR., and MICHAEL WARGOTZ, | § § § § § § § § § | |
| | § | |
| Defendants. | § | |

## CLASS ACTION COMPLAINT

Plaintiff Richard Malone ("Plaintiff"), on behalf of himself and all others similarly situated, by his undersigned attorneys, alleges the following upon information and belief, including the investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiff on behalf of himself and the other public shareholders of CST Brands, Inc. ("CST" or the "Company "), other than Defendants and their affiliates, against CST and the members of its board of directors (the "Board" or the "Individual Defendants," and together with CST, "Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger between CST

and Circle K Stores, Inc. ("Circle K"), an indirect wholly owned subsidiary of Alimentation Couche-Tard Inc., and Ultra Acquisition Corp. ("Merger Sub").

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the SEC.  The Proxy recommends that CST shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby CST will merge with Merger Sub and become a wholly owned subsidiary of Circle K. Pursuant to the terms of the agreement and plan of merger these entities entered into (the "Merger Agreement"), CST shareholders stand to receive $48.53 in cash per share (the "Merger Consideration").

3.     As discussed below, the Merger Consideration and the process by which Defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other common shareholders of CST.  Defendants have now asked CST's shareholders to support the Proposed Transaction in exchange for inadequate consideration based upon the materially incomplete and misleading representations and information contained in the Proxy, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy contains materially incomplete and misleading information concerning the financial analyses conducted by Bank of America Merrill Lynch ("BofA Merrill Lynch"), CST's financial advisor, as well as disabling conflicts by BofA Merrill Lynch for past for work it has performed for both Circle K.

4.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to CST's shareholders, unless and until the material information

discussed below is included in the Definitive Proxy or otherwise disseminated to CST's shareholders.  In the event that the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

6.     Personal jurisdiction exists over each Defendant either because Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) CST maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

8.     Plaintiff is, and has been at all relevant times, a CST stockholder.

9.    CST is a Delaware Corporation that maintains its principal executive offices at One Valero Way, Building D. Suite 200, San Antonio, Texas, 78249.  The Company trades on the New York Stock Exchange under the ticker symbol "CST."  In the United States, CST sells motor fuel (primarily under the Valero, Shell and Diamond Shamrock brands), convenience merchandise items and other services through convenience stores operated predominately under the Cornet Store name.  In Canada, CST sells Ultramar-branded motor fuel, convenience merchandise items and other services through convenience stores operated under the Corner Store/Dépanneur du Coin names.  The Company also operates cardlock and heating oil businesses in Canada.

10.   Defendant Kim Lubel ("Lubel") has served as President and Chief Executive Officer of the Company since 2013 and has served as a member of the Board since November 2012 and Chairman of the Board since 2013.

11.   Defendant Alan Schoenbaum ("Schoenbaum") became a member of the Board in April 2013.  He is the Lead Director of the Board and chair of the Executive Committee.

12.   Defendant Donna M. Boles ("Boles") became a director of the Company in April 2013 and is chair of the Compensation Committee.

13.   Defendant Roger G. Burton ("Burton") has served as a member of the Company's Board since April 2013.  Also, he is chair of the Audit Committee.

14.   Defendant Rocky B. Dewbre ("Dewbre") has served as a member of the Company's Board since March 2016 and is a member of the Compensation Committee.

15.   Defendant Thomas ("Tad") W. Dickson ("Dickson") has served as a director of the Company since March 2016 and serves on the Nominating and Governance Committee.

16.     Defendant Ruben M. Escobedo ("Escobedo") has served on the Company's Board since April 2013.

17.     Defendant Denise Incandela ("Incandela") has served on the Company's Board since June 2013 and is a member of the Compensation Committee.

18.     Defendant Joseph E. Reece ("Reece") has served on the Company's Board since November 2015 and is a member of the Executive and Nominating and Governance Committees.

19.     Defendant Stephen Smith ("Smith") has served on the Company's Board since March 2014 and is a member of the Audit and Executive Committees.

20.     Defendant Joseph V. Topper, Jr. ("Topper") has served on the Company's Board since October 2014.

21.     Defendant Michael Wargotz ("Wargotz") has served on the Company's Board since April 2013 and serves on the Executive Committee and is Chair of the Nominating and Governance Committee.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action on his own behalf and as a class action, pursuant to Court of Chancery Rule 23, on behalf of all CST stockholders (except Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant) and their successors in interest, who are threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

23.     This action is properly maintainable as a class action.  The Class is so numerous that joinder of all members is impracticable.  As of August 3, 2016, there were over 75 million shares of CST common stock outstanding, likely owned by thousands of stockholders who are geographically dispersed.

24.     Questions of law and fact are common to the Class, including, *inter alia*:

      i.    Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

      ii.    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

      iii.    Whether Plaintiff and the other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated.

25.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other Class members. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.

**SUBSTANTIVE ALLEGATIONS**

28.     In April 2013, CST was created as a result of the Valero Energy Corporation spinning-off its retail business. As a standalone company, CST became one of the largest independent retailers of motor fuel and convenience merchandise in Northern America.

Nevertheless, CST sought to expand its operations and initiated an acquisition strategy. Despite its efforts, CST's stock continued to underperform its peers in the marketplace, which caused certain CST stockholders to question CST's growth strategy and the abilities of CST's management.

29.    On December 9, 2015, Engine Capital, LP ("Engine"), a private equity firm owning one percent of CST's outstanding stock, sent a letter to the Board complaining about CST's underperformance. In its letter, Engine explained that it was concerned that CST was: (1) underperforming in its merchandising operations; (2) overpaying acquisition targets; (3) lagging behind its competitors in merchandising; (3) mismanaging its real estate assets; (4) overpaying certain executives and failed to tie executive compensation to shareholder performance; (5) not adhering to corporate governance best practices; and (6) inadequately communicating with shareholders. With these concerns in mind, Engine concluded that CST was undervalued. Engine further concluded that if CST could not correct these issues, then the Board should initiate a review of its strategic alternatives including the possible sale of CST, which Engine believed could earn shareholders $50-55 per share. Engine fell short of opining that CST's only option was to be sold.

30.    On December 28, 2015, JCP Investment Management, LLC ("JCP") also sent a letter to the Board that addressed similar concerns. As Engine, JCP concluded that CST should review its strategic alternatives but also implied that a sale was the likely path for CST.

31.    Engine became dissatisfied with the Board's response to its concerns after the release of CST's Q4 2015 results. As a result, Engine issued a press release informing the public that it intended to nominate its own slate of directors. Similarly, JCP announced its own slate of directors.

32.    In anticipation of a proxy contest, CST entered into settlement agreements with Engine and JCP in March 2016.  Both settlements required CST to begin exploring alternative strategies, which included the possible sale of the Company.  Further, Engine and JCP were given seats on the Board.  Engine selected Dewbre.  JCP selected Dickson, who had served on the board of directors of the Pantry, Inc. with JCP's James C. Pappas during its sale to Couche-Tarde.

33.    By June 2016, it seemed all but certain that CST would be acquired.  CST received bids from both Circle K and Seven & i Holdings Co., operator of Seven Eleven convenience stores.  Further, rumors were circulating that CST Chairman and CEO Lubel would be ousted if a deal was not consummated by the end of 2016.

34.    Shortly before the announcement of the Proposed Transaction, on August 8, 2016, the Company announced bullish financial results and increased guidance.  More specifically, CST announced that for the second quarter of 2016 its U.S. Merchandise & Services division's gross profits grew 27% over the Second Quarter 2015.  The Company also announced adjusted EBITDA of $98 million, which was a 23% increase over Q2 2015 results.  The Company, in part, attributed these gains to the fact that its company-operated store base grew by 19% while operating expenses only increased 16%.  Additionally, CST was able to lower its outstanding debt with proceeds from the sale of its underperforming California and Wyoming stores.  Further, CST announced that its Board was still reviewing its strategic alternatives.

35.    After the announcement of second quarter results, numerous analysts issued favorable reports with price targets well above the implied consideration offered by the Proposed Transaction.

36.     For example, Gabelli & Company ("Gabelli"), on August 8, 2016, placed a $55 target price on CST shares for 2016.  Gabelli explained that this valuation was based on a 10x multiple of EBITDA, which essentially valued each CST store at $3.1 million despite CST selling its underperforming California and Wyoming stores at $5.1 million per store.

37.     Similarly, Wells Fargo Securities ("Wells Fargo") valued the Company between $51 and $53 per share while noting its analysis showed that even $56 per share was possible.  In concluding, Wells Fargo opined that any sale would at least see a price over $50 per share.

38.     Macquarie Capital, as early as June 2016, had placed a target price on CST shares at $55.  By August 16, 2016, Macquarie had placed CST's valuation between $50 and $60 per share.

39.     Despite market views that CST was worth in excess of $48.53 per share, CST and Circle K jointly announced the Proposed Transaction on August 22, 2016.  Curiously, the press release announced that the $48.53 per share offering was a 42% premium over CST's market price on March 3, 2016, when the Board began to review its strategic alternatives; a price that did not incorporate CST's 2016 performance or the sale of the California and Wyoming stores.

40.     Not surprisingly, the market's reaction to the Proposed Transaction was lukewarm at best.

41.     Macquarie lowered its rating of CST to neutral and placed a target price in line with the proposed $48.53 per share.  Macquarie's sole reasoning was that it believed the deal would go through.

42.     Wells Fargo lowered its rating of CST from outperform to market perform and lowered its valuation range to $48-50 per share to be in line with the Proposed Transaction.  In

justifying its downgrade, Wells Fargo stated that any upside from CST's increasing profitability would be limited by the pending deal, which Wells Fargo believed would close quickly.

43.     Gabelli changed its position on CST from buy to hold because of the Proposed Transaction.  Gabelli noted that although the $48.53 per share price was well below its target price of $55, Gabelli did not believe another bidder come forward.

44.     As such, the Merger Consideration severely undervalues the Company and its stockholders' investments.  Rather than allow CST's common stock to trade freely and permit its public stockholders to share in the benefits of the Company's financial success, the Individual Defendants, to the detriment of the Company's public stockholders, entered into the Proposed Transaction.  In so doing, the Individual Defendants have agreed to a transaction that places a cap on CST's corporate value at a time when the Company is poised for growth.

45.     Having failed to secure a reasonable sale price for the Company, members of the Board breached the fiduciary duties they owe to Plaintiff and the Company's public stockholders, because the Company has been improperly valued and stockholders will not receive adequate or fair value for their CST common stock in the Proposed Transaction.

### The Conflicts of Interest

46.     The Board is conflicted because a majority of the directors had incentives to consummate a quick sale due to their compensation structure, employment and director arrangements, and relationships with activist investors.

47.     First, all 12 directors had an incentive to approve the Proposed Transaction because the Merger Agreement allows for the immediate vesting of all restricted stock awards. Per their agreements with CST, even in the event of a change of control, the Board would have to wait for their shares to vest, which could take as long as three years.  The Proposed Transaction

allows them to quickly cash in on those awards.  This is especially true for Reese, Dickson, and Dewbre, who were all appointed or elected within the past year.

48.     Second, Lubel's employment as CEO of CST gave her incentive to consummate a deal before year end.  As previously noted, certain news outlets had come to believe that she would be removed from her position if the Company was not sold by the end of 2016.  There is also reason to believe that the Board, entirely, was fearful of being ousted if they did not consummate a deal, which may have had a negative impact on their compensation.  Less than a year earlier, the Board watched two activist investors, owning less than one percent of CST shares respectively, force one director into retirement, have their own representatives elected, and initiate a review of strategic alternatives.  With over 29 other private equities now invested in CST stock, the Board could see the writing on the wall and placed their own interests ahead of the Company and its shareholders.

49.     Last, Dewbre and Dickson can hardly be considered independent and disinterested considering the way they were appointed directors.  Dewbre represents Engine's interests, which are not necessarily in line with other CST shareholders due to the nature of private equity funds.  Dickson represented JCP's interests, which again have differing interests from typical shareholders.  Further, it is no coincidence that JCP selected Dickson as its representative considering the two worked together in securing the sale of the Pantry, Inc. to Couche-Tard a year earlier.

### The Preclusive Deal Protections

50.     On top of the inadequate Merger Consideration and conflicts of interest, the Board also agreed to terms in the Merger Agreement that substantially favor Circle K and are calculated to unreasonably dissuade potential suitors from making competing offers.  The terms

of the Merger Agreement demonstrate that the Individual Defendants agreed to numerous terms designed to ensure that no other potential bidder would emerge to offer a superior bid for the Company.

51.     Specifically, the Merger Agreement provides for, *inter alia*: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose the identity of any competing bidder and to furnish Circle K with the terms of any competing bid or confidentiality agreement; (iii) a matching rights provision which gives Circle K five business days to match any competing bid; and (iv) a provision that requires the Company to pay Circle K a termination fee of up to $133 million to enter into a transaction with a superior bidder.

52.     First, the Merger Agreement includes a "No Solicitation" provision which broadly provides that neither CST, nor any of its affiliates, may solicit or proactively seek a competing and better offer, nor can they provide information to, or engage in discussions with, any potential bidder for the Company.  In effect, this provision prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals, all but ensuring that another entity will not emerge with a competing proposal.

53.     Second, Section 5.4(c) of the Merger Agreement also includes an "Information Rights" provision pursuant to which the Company is required to promptly notify Circle K, within 24 hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal. Circle K may then use this unfettered access to confidential, non-public information about

competing proposals from third parties to formulate a matching bid, virtually eliminating any leverage that the Company has in receiving the unsolicited offer, and significantly deterring an alternative buyer from coming forward.

54.     Third, Section 7.3 of the Merger Agreement includes a "Termination Fee" provision which requires the Company to pay a termination fee of up to $133 million to Circle K in the event that the Board rescinds its recommendation in favor of the Proposed Transaction and recommends a competing proposal pursuant to the lawful exercise of its fiduciary duties.  This further reduces the possibility of a superior proposal from a third party because a competing bidder would ultimately be required to pay a premium for the right to provide Envision stockholders with a superior offer.

55.     Ultimately, these preclusive deal protections and voting provisions improperly restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all of or a significant interest in the Company.  The narrow circumstances under which the Individual Defendants may respond to alternative proposals, and the Company's inability to terminate the Merger Agreement if it accepts a superior proposal, fail to provide an effective "fiduciary out" under the Merger Agreement.  By agreeing to these onerous deal protections, the Board has breached its fiduciary duties to CST stockholders, including Plaintiff, and Barclays has actively aided and abetted such breaches.

***The Materially Incomplete and Misleading Proxy***

66.     On September 16, 2016, Defendants filed the Proxy with the SEC.  The information contained in the Proxy has thus been disseminated to CST shareholders to solicit their vote in favor of the Proposed Transaction.  The Proxy omits certain material information concerning the fairness of the Proposed Transaction and Merger Consideration.  Without such

information, CST shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

67.     First, the Proxy fails to provide a fair summary of the projections used by BofA Merrill Lynch in support of its analysis.  In particular, the Proxy attempts to disclose CST's projections at page 30 but completely omits the most relevant line item required by law to be disclosed – the unlevered free cash flow figures.  This line item is the most important projected line item for CST shareholders to have and in fact without it the D*iscounted Cash Flow and Discounted Distributions Analysis* performed by BofA Merrill Lynch and partially disclosed in the Proxy is materially misleading.

68.     Second, with respect to BofA Merrill Lynch's Selected Publicly Traded Companies Analysis, the Proxy fails to disclose the range, median and mean revenue and EBITDA multiples for the selected companies.  Rather, the Proxy only discloses the range of multiples BofA Merrill Lynch applied, which were "derived from the selected publicly traded companies."  Proxy at 33.  The range, median and mean multiples for the selected companies are material information that a reasonable shareholder would consider important in determining whether or not to approve the Proposed Transaction.  The omission of this information from the Proxy renders this section of the Proxy materially misleading because shareholders have no way of determining whether the ranges BofA Merrill Lynch applied were reasonable when compared to the multiples observed for the selected companies, and thus, have no way of determining whether the implied per share equity reference ranges accurately reflect the value of their shares.

69.     Third, with respect to BofA Merrill Lynch's Selected Precedent Transactions Analysis, the Proxy fails to disclose the range, median and mean revenue multiples for the selected transactions.  Rather, the Proxy only discloses the range of multiples BofA Merrill

Lynch applied, which were "derived from the selected transactions."  Proxy at 34.  The range, median and mean multiples for the selected transactions are material information that a reasonable shareholder would consider important in determining whether or not to approve the Proposed Transaction.  The omission of this information from the Proxy renders this section of the Proxy materially misleading because shareholders have no way of determining whether the range BofA Merrill Lynch applied was reasonable when compared to the multiples observed for the selected transactions, and thus have no way of determining whether the implied per share equity reference range accurately reflects the value of their shares.

70.     The Proxy discloses that BofA Merrill Lynch has done work in the past for Circle K in tune of $22 million.  Proxy at 38.  However, the Proxy is devoid of any disclosure of whether CST or its Board even knew about the fact that Circle K had paid BofA Merrill Lynch $22 million in the past or whether that is disabling conflict that should have refrain CST from hiring BofA Merrill Lynch as its financial advisor.  Defendants have knowingly, recklessly, or negligently omitted the above-referenced material information from the Proxy, in violation of the Exchange Act.  Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that CST shareholders will suffer absent judicial intervention.

***Defendants Knew or Recklessly Disregarded that the Proxy Omits Material Information***

71.     The Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

72.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC.  Indeed, as directors of the Company, they were required to do so.  The Individual Defendants thus knew or recklessly disregarded that the Proxy omits

the material information referenced above and contains the incomplete and misleading information referenced above.

73.     Further, the Proxy indicates that on August 21, 2016, BofA Merrill Lynch reviewed with the Board its financial analysis of the merger consideration and delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion dated August 21, 2016, to the effect that the Merger Consideration was fair, from a financial point of view, to CST shareholders.  Proxy at 31.  Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning BofA Merrill Lynch's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

## COUNT I

### On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     Defendants have filed the Proxy with the SEC with the intention of soliciting CST shareholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

76.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of CST, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

77.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

78.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) the value of CST shares and the financial analyses performed by BofA Merrill Lynch in support of its fairness opinion; and (ii) potential disabling conflicts by BofA Merrill Lynch for previous work done for Circle K not considered by CST and its Board.

79.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that BofA Merrill Lynch reviewed and discussed its financial analyses with the Board during various meetings including on November 1, and further states that the Board relied upon BofA Merrill Lynch's financial analyses and fairness opinion in connection with approving the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

80.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations

and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

81.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

82.    The Individual Defendants acted as controlling persons of CST within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of CST and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

83.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

85.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

86.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

87.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

88.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants, jointly and severally, as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to CST shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.     Directing Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.     Granting Plaintiff such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 26, 2016.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____

Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720
tbilek@bileklaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

Juan E. Monteverde
**MONTEVERDE & ASSOCIATES PC**
350 Fifth Avenue, 59th Floor
New York, NY  10118
Tel: (212) 971-1341
Fax: (212) 601-2610
jmonteverde@monteverdelaw.com

Nadeem Faruqi
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY  10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
jfaruqi@faruqilaw.com